EXHIBIT 2

15 Page Response to ISB
Dated: March 15, 2022

March 15, 2022

**Via E-mail**

Office of Bar Counsel
Attn: Joseph Pirtle, Bar Counsel
525 West Jefferson
P.O. Box 895
Boise, ID  83701

RE:   ISB v. Jeremy Morris
      ISB File Nos. 21-312 and 22-014

Dear Mr. Pirtle:

I am writing in response to your letter, dated January 17, 2022, through which you requested that I respond to certain matters raised by grievance numbers 21-312 and 22-014. The following responses should address any concerns. Please let me know if you require further information after reviewing this letter.

## I.  NECESSARY BACKGROUND

On January 5, 2015, my wife and I entered into a contract to purchase a home in West Hayden Estates in Hayden, Idaho. The home was part of a homeowner's association ("HOA"). In an effort to reach out to the HOA and offer for them to get involved in a charity Christmas program, I contacted the President of the HOA, Jennifer Scott, on January 12, 2015. During my phone call with Ms. Scott, I described a Christmas program wherein we decorate our house with Christmas lights and invite people to the home, and the proceeds would go to charity (hereinafter "the Christmas Program."). I specifically told Ms. Scott that the Christmas Program was my "Christian ministry," and we handed out candy canes with scripture to Christmas Program participants. During that call, I informed Ms. Scott that I had reviewed the CC&Rs, had communicated with two separate attorneys, and we all concluded that the Christmas Program would not violate any of the HOA's CC&Rs. Again, the purpose of the call was not to seek permission to host the Christmas Program but rather to encourage participation from my neighbors and the HOA.

On January 15, 2015, Pat Kellig, a member of the Board, sent a letter (on behalf of the Board) to my wife and me (hereinafter "the January 2015 letter"). (Attached hereto as **Exhibit "A"** is a copy of Judge Winmill's Memorandum Decision and Order, which quotes from the January 2015 letter.) I firmly believe the January 2015 letter discriminated against my family based on our religion. Below is an excerpt from that letter:

> And finally, I am somewhat hesitant in bringing up the fact that some of our residents are non-Christians or of another faith and I don't even want to think of the problems that could bring up. It is not the intention of the Board to discourage you from becoming part of our great neighborhood but we do not wish to become entwined in expensive litigation to enforce long standing rules and regulations and

fill our neighborhood with the hundreds of people and possible undesirables. We have worked hard to keep our area peaceful, quiet, and clean. Neighbors respect the CC&R's and show common courtesy to those around them. These are why people want to live here.

Despite the discriminatory nature of the January 2015 letter, my family hosted the Christmas Program in 2015 and 2016. Issues arose at the Christmas Program between HOA Members and program participants. As a result, I contacted the HOA, again asking to be de-annexed from the HOA. In return, I promised not to file suit against the HOA for the discrimination that occurred against my family for our religious beliefs. The HOA rejected my request. I then received a letter indicating that the HOA intended to sue me for the Christmas Program. Despite multiple instances of turning the other cheek, my wife and I filed suit against the HOA on the last day of the statute of limitations, alleging religious discrimination in violation of the Fair Housing Act and the Idaho Human Rights Act. The complaint was filed in the United States District Court for the District of Idaho, with Judge B. Lynn Winmill presiding. Though an attorney, I was not the lead attorney at trial. Instead, Brad Miller, a lawyer with years of experience as a JAG officer and in private practice before over 35 trials in federal court, served as lead trial counsel.

On October 22, 2018, Judge Winmill began jury selection. (Most of my assertions relate to Judge Winmill's conduct at trial and will be described in detail below.) During voir dire, Judge Winmill had the following interaction with juror number 11 that caused me great concern and outright disgust.

| | |
|---|---|
| The Court: | All right. Now, let me ask -- and I have no idea if there has been any pretrial publicity of this case. But let me just ask: By show of hands, is there any member of the panel who feels you may have heard or read something about this case? |
| | Okay. Juror No. 11 and Juror No. 13. |
| | Anyone else? |
| | All right. Let's pass the microphone to Juror No. 11. Juror No. 11, without telling us what you know, could you tell us the source of the information? |
| Juror No. 11: | Where I formerly worked, which I said was a lot of community managers, they discussed the details of the case quite a bit. So I have heard some of the details surrounding it. |
| The Court: | Okay. That does not, by itself, disqualify you from serving on a jury. However, what you would have to be able to do is put that out of your mind and decide this case solely upon the evidence presented here in the courtroom. |

                    And I can't answer in terms of your ability to do that. It -- you know, as you understand, you know, quite often, for example, jurors will have heard something about it in a TV newscast or perhaps read something in the newspaper. And what I tell jurors there is that newspapers and television stations are in the business of selling ads. We are in the business of hopefully rendering justice. And so it's a very different situation in which we are involved. And so the hearsay, secondhand information really needs to be put out of your mind and the case decided upon the facts presented here in the courtroom.

                    Do you have any reservations about your ability to do that?

Juror No. 11:   I do, just from the fact that I uphold sort of the covenants and the CC&Rs of -- you know, I kind of hold those in a high esteem. **So I feel like I would probably be a little prejudiced in that way.**

(Attached hereto as **Exhibit "B"** is a copy of transcripts from the underlying trial before Judge Winmill.)  (**Exhibit B**, pp. 27-28, lines 9-17.) (Emphasis added.)  Despite stating she would be "prejudiced" for the HOA, Judge Winmill continued to question juror no. 11 in what appeared to be an attempt to keep this prejudiced individual on the jury.

     Due to juror no. 11's statement that she would be prejudiced in favor of the HOA (and as a result against my wife and me), Attorney Miller pleaded with the court, "[she] has already stated—she actually used the word, 'prejudiced' herself. That she would be prejudiced for the HOA." (**Exhibit B**, p. 71, lines 22-24.)  Rather than strike juror no. 11, Judge Winmill responded:

The Court:   All right. I think Juror No. 11—she did use the word "prejudiced" at the very beginning. But I think after it was explained to her and she was provided a context, she indicated quite confidently she could be fair and impartial. She doesn't want to be here, but I think she's willing to do her duty.

                  **But I -- just using the word "prejudiced" once isn't enough to be a challenge for cause. So I'll overrule that challenge for cause.**

(**Exhibit B**, p. 72, lines 16-24.) (Emphasis added.)

     Attorney Miller later questioned juror no. 11 and, during that questioning, she admitted that she had been involved in discussions about the present case with HOA managers and that she worked with HOAs and had been instructed previously to always "err on the side that the HOA covenants are correct and the homeowners are wrong." (**Exhibit B**, p. 97, lines 16-24.) Juror 11 then stated, "I would come into it with a bit of **bias** that way." (**Exhibit B**, p. 97, line 22.) (Emphasis added.)  When further questioned by Attorney Miller, juror no. 11 provided:

> Mr. Miller: Now, prior, when the court was asking you questions, you used the word "prejudiced." What did you mean by that you would be prejudiced toward a homeowners association?
>
> Juror No. 11: I would be actually more prejudiced, I guess, against the homeowner. Because we have so many homeowners that come and feel like they are special, and they don't have to abide by the CC&Rs because they have these extenuating circumstances that don't apply to them.
>
> Mr. Miller: Now, when you say "prejudice," I'm just trying to understand kind of your analysis of how you walk through some of these -- these questions. Are you saying that when somebody brings a complaint to you, now that you're a member of a board, that your initial thought is that the homeowner is probably wrong?
>
> Juror No. 11: That's correct.

(**Exhibit** B, pp. 97-98, lines 24-11). Despite juror no. 11 saying she was biased and prejudiced against me and my family, Judge Winmill would not strike juror no. 11 for cause because she later said she could be fair.

Attorney Miller engaged in numerous sidebars with Judge Winmill during voir dire. Following his interactions with Judge Winmill, Attorney Miller frequently returned to our table and explained how unusual he found Judge Winmill's behavior. In fact, Attorney Miller told my wife and me that in his many trials, he had never seen a judge in state or federal court act in this manner. Those actions included Judge Winmill's refusal to remove a potential juror for words like "bias" and "prejudice."

After the jury had been empaneled and the trial had started, Judge Winmill decided the jury would not be permitted to decide the counterclaim. This decision prevented Attorney Miller from raising many arguments we had prepared for our case. Our case was essentially that through the January 2015 letter and then years of harassment and tape-recorded admissions, the HOA engaged in discrimination and violated Fair Housing. But the HOA claimed their actions were not discriminatory (despite letters referencing our religion and tape-recorded admissions). This ruling on the counterclaim effectively prevented my counsel from arguing our case. Even evidence relating to selective enforcement of the CCRs, which was the backbone of our fair housing claim and witness questioning regarding how my family was singled out, was repeatedly denied on the basis that it pertained to the counterclaim.

Judge Winmill also struck testimony from our witnesses on the basis that they were discussing "third-party conduct" and not the HOA. This contradicted HUD's rulings that allowed HOAs to be held accountable for the third-party conduct of others if the HOA could control such action. Four women whom I had never known personally that attended the Christmas Program testified to assault and battery by members of the HOA, and Judge Winmill struck all testimony on the basis that it was third-party conduct. When Attorney Miller informed Judge Winmill that

one of the women who testified had evidence of direct harassment from an HOA Board member (and not a third-party HOA member), Judge Winmill indicated he had already decided to strike the entire testimony of that witness. (**Exhibit B**, pp. 576-578, lines 25-4.)

With regard to a video recording of an HOA member making a death threat towards me, Judge Winmill engaged in a lengthy discussion about a death threat videotape and asserted that it was not even a death threat in front of the jury. Judge Winmill did not provide the jury with the information regarding what was said in the video for them to reach their own conclusions.

After a nearly two-week trial and two days of deliberations for a period of 15 hours, the jury returned a favorable verdict on our claims. The jury verdict was unanimous on all claims: the HOA had discriminated before and after the sale (3604b), the HOA sent a writing indicating a religious preference against my family (3604c), and the HOA had engaged in harassment based on my family's religion.

Approximately five months after the unanimous jury verdict, Judge Winmill reversed the jury and ordered my family to pay the HOA's attorney fees ($112,000). (**Exhibit A**.) Judge Winmill also ordered our family to terminate the Christmas Program. (The Memorandum Decision and Order will be discussed at length below.) It is not hyperbole to say my family lost nearly everything due to Judge Winmill's decision to overturn the unanimous jury verdict. On May 6, 2019, we appealed Judge Winmill's decision. On June 5, 2020, the Ninth Circuit heard oral argument on our appeal. The appeal is currently pending.

Not a day has passed since Judge Winmill's decision, that I have not thought about the decision and what it caused my family. My family has been forced to move from our home and the State of Idaho. My family has received death threats. I have had to deal with the FBI on multiple occasions due to these threats. I firmly believe Judge Winmill improperly and abhorrently reversed the unanimous jury verdict based on his biases. My calling out the Judge for this conduct is identical to what occurred in *Yagman* when the attorney referred to the judge as "dishonest" and had reached decisions based on being a "right-wing fanatic" and having antisemitic beliefs. My language was meant to describe the contempt I hold for Judge Winmill and provide the basis for such contempt. I felt so strongly about the injustice that occurred via Judge Winmill's conduct and decision that, on June 2, 2021, I filed a Complaint for Judicial Misconduct against Judge Winmill. (Attached hereto as **Exhibit "C"** is a copy of the Affidavit of Jeremy R. Morris submitted as a part of the judicial misconduct filing.)

## II.   ANALYSIS

**A.   Whether my conduct constituted a violation of Rule 8.2(a) of the Idaho Rules of Professional Conduct.**

Rule 8.2(a) of the Idaho Rules of Professional Conduct provides:

(a) A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge . . . .

I.R.P.C. 1.2(a). Rule 8.2(a) of the Idaho Rules of Professional Conduct is identical to American Bar Association's Model Rule 8.2(a). The drafters of the Model Rule recognized: "Expressing honest and candid opinions on such matters contributes to improving the administration of justice. Conversely, false statements by a lawyer can unfairly undermine public confidence in the administration of justice." ABA Model Rule 8.2(a) Comments.

The fundamental issue in this bar dispute is the right to free speech to criticize the judiciary, which must be recognized for attorneys when acting as officers of the court and as private citizens. Attorney criticism of the judicial system is an important and substantial right, in that attorneys have special knowledge of the judicial system and are in a special position to use that knowledge to improve the system and correct its mistakes.

In First Amendment cases involving important countervailing interests, the federal courts have balanced these interests against the speaker's interests in an attempt to accommodate both. See *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991) (balancing the State's interest in assuring fair trials against the free speech interest of attorneys). The Idaho Supreme Court has similarly taken this approach, following the Ninth Circuit's decisions in *Sandlin* and *Yagman* (discussed below). *See, e.g.*, *Idaho State Bar v. Topp*, 129 Idaho 414, 417, 925 P.2d 1113, 1116 (1996).

In *United States Dist. Court v. Sandlin*, 12 F.3d 861 (9th Cir. 1993), a case involving the application of a rule identical to Idaho's Rule 8.2(a), the court recognized the competing interests identified above. It held that, in light of the compelling state interests served by Rule 8.2(a), the rule should be read to impose an objective malice standard on attorneys. *Id.* at 867. According to that court, in considering the "reckless disregard" prong of Rule 8.2(a), the standard applied is "what the reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances." *Id.*

The *Sandlin* analysis was further refined in *Standing Committee on Discipline v. Yagman*, 55 F.3d 1430 (9th Cir. 1995), where the court identified the additional requirement that the disciplinary body establish that the attorney's statements were false. The importance of the *Yagman* decision cannot be understated.[1]

> In *Yagman*, an attorney wrote a letter critical of a judge in which he stated, in part: It is an understatement to characterize the Judge as "the worst judge in the central district." It would be fairer to say that he is ignorant, dishonest, ill-tempered, and a bully, and probably is one of the worst judges in the United States.

55 F.3d at 1434 n.4. Yagman further stated the judge was "drunk on the bench" and had "a penchant for sanctioning Jewish lawyers: me, David Kenner and Hugh Manes. I find this to be

---

[1] It is important to note that Yagman was attempting to disqualify the judge and "judge shop." The disciplinary board and Ninth Circuit took issue with this conduct and/or the benefit that Yagman may have been trying to gain based on his comments to a colleague. In my case, there was no potential benefit regarding my expressions about Judge Winmill, aside from alerting the public to what had occurred. This difference warrants further protection of my opinions, as there was no improper motive behind my actions.

evidence of anti-semitism." *Id.* at 1434. Yagman was subsequently disciplined by a federal district court for alleging that the judge was "dishonest." *Id.* at 1440.

On appeal, the Ninth Circuit Court of Appeals reversed, concluding that when considered in context, Yagman's statement "cannot reasonably be interpreted as accusing Judge Keller of criminal misconduct." *Id.* at 1440. To that point, the Ninth Circuit stated:

> The term "dishonest" was one in a string of colorful adjectives Yagman used to convey the low esteem in which he held Judge Keller. The other terms he used "ignorant," "ill-tempered," "buffoon," "sub-standard human," "right-wing fanatic," "a bully," "one of the worst judges in the United States"—all speak to competence and temperament rather than corruption; together they convey nothing more substantive than Yagman's contempt for Judge Keller. Viewed in context of these "lusty and imaginative expression[s]," the word "dishonest" cannot reasonably be construed as suggesting that Judge Keller had committed specific illegal acts. Yagman's remarks are thus statements of rhetorical hyperbole, incapable of being proven true or false.

*Id.* at 1438 (citations omitted). The Ninth Circuit further provided that statements are less likely to be expressions of fact where—as here—the speaker fully discloses all relevant facts. In determining whether the contested statement "could reasonably be understood as declaring or implying actual facts," the Ninth Circuit noted that there are "two kinds of opinion statements: those based on assumed or expressly stated facts, and those based on implied, undisclosed facts." *Id.* at 1438-39. An "opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning." *Id.* at 1439. This rule is quite logical: "When the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts." *Id.* Applying this rule to the attorney's contested statement in *Yagman*, the Ninth Circuit held that the "remark [wa]s protected by the First Amendment as an expression of opinion based on stated facts." *Id.* at 1440.

The Idaho Supreme Court has further analyzed the *Yagman* decision.[2] In *Idaho State Bar v. Topp*, 129 Idaho 414, 416, 925 P.2d 1113, 1115 (1996), an attorney who attended a hearing (and who was not involved in the case) was reprimanded for stating to the press that the ultimate decision differed from a similar case because the judge in the first decision "wasn't worried about the political ramifications." His statement "necessarily implied that Judge Michaud based his decision on completely irrelevant and improper considerations" and thus "impugned his integrity." *See id*. at 418, 925 P.2d at 1117. When discussing *Yagman's* approach, the Idaho Supreme Court held:

---

[2] I would be remiss not to mention, as noted above, I was not the lead attorney at trial. I was not even counsel at trial. Everything I witnessed Judge Winmill do as our case unfolded was as a party, not an attorney. I understand that the Rules of Professional Conduct apply to attorneys not only when they are serving as officers of the court, but this difference does distinguish this matter and my opinions from those discussed in *Sandlin*, *Yagman*, and *Topp*.

> This formulation strikes a reasonable balance between the right of free speech and the State's legitimate interest in preserving the integrity of its judicial system. The speaker's interest is accommodated by the requirement that the State prove the statement was false and that the speaker lacked a reasonable basis for the statement. The State's interest is accommodated by the fact that it need not prove subjective malice.

*Id.* at 417, 925 P.2d at 1116. The *Topp* decision further provided:

> Statements impugning the integrity of a judge "may not be punished unless they are capable of being proved true or false; statements of opinion are protected by the First Amendment unless they 'imply a false assertion of fact.'" *Standing Comm. on Discipline v. Yagman*, 55 F.3d 1430, 1438 (9th Cir. 1995) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990); *Lewis v. Time, Inc.*, 710 F.2d 549, 555 (9th Cir. 1983); Restatement (Second) of Torts § 566 (1977)). Topp contends that his comments to the media were merely statements of opinion which must be afforded constitutional protection.
>
> In determining whether a statement is an assertion of fact or of constitutionally protected opinion, "[t]he important consideration . . . is not whether the particular statement fits into one category or another, but whether the particular article provided sufficient information upon which the reader could make an independent judgment for himself." *Wiemer v. Rankin*, 117 Idaho 566, 572, 790 P.2d 347, 353 (1990) (quoting Herbert W. Titus, *Statement of Fact Versus Statement of Opinion— A Spurious Dispute in Fair Comment*, 15 Vand.L.Rev. 1203, 1216 (1962)). Thus, even statements which appear to be opinion will nonetheless be treated, for constitutional purposes, as assertions of fact if the speaker implies that he is privy to undisclosed facts and that he has "private, first-hand knowledge which substantiate[s] the assertions made." *Id.* When such statements are made, the audience is not given sufficient information upon which to form an independent judgment; therefore, the expression of opinion is as damaging as an assertion of fact. *Id.* at 571-72, 790 P.2d at 352-53 (citations omitted).

*Id.* at 416, 925 P.2d at 1115.

1. *The statements regarding Judge Winmill were either true and/or constitutionally protected opinion.*

The Idaho State Bar has identified statements I made about Judge Winmill. Each statement will be addressed separately to the extent necessary. Those statements are quoted below for ease:

- "[T]hat Federal Judge flipped the verdict and ordered my family to pay $112,000 of their legal fees. So we have a corrupt judge." Apple docuseries "Twas the Fight Before Christmas"

- "[T]he corrupt, Federal Judge Winmill, who tried to rig a jury, who's now facing a misconduct charge that I filed against him."  Facebook video post.
- "THE JUDGE IS A HATEFUL ANTI-CHRISTIAN BIGOT."  Caption at the bottom of the Facebook video post.
- "The Judge attempted to rig my jury."  December 27, 2021 Facebook post.
- "A crooked federal judge flipped the verdict and ordered my family to pay the HOA that discriminated against my family $112,000."  January 13, 2022 Facebook post.
- "Where were the hundreds of people in the community holding candles and singing silent night on my lawn as a crooked judge overturned a unanimous jury and stole Christmas[.]"  January 27, 2022 Facebook post.
- "The Hayden Christmas Show may not be returning to Hayden because Idaho has a fascistic federal judge who overturns juries after failing to rig them – but thankfully these wonderful Christmas lights will be going to good use very soon!"  April 10, 2022 Facebook post.

It is my firm position that my statements about Judge Winmill are either based on true facts (what occurred at trial/post-trial) and/or my opinions that I drew from those facts.  As noted in *Yagman*:

> Attorneys who make statements impugning the integrity of a judge are, however, entitled to other First Amendment protections applicable in the defamation context.  To begin with, attorneys may be sanctioned for impugning the integrity of a judge or the court only if their statements are false; truth is an absolute defense.  *See Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). Moreover, the disciplinary body bears the burden of proving falsity. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77, 106 S.Ct. 1558, 1563-64, 89 L.Ed.2d 783 (1986); *Porter*, 766 P.2d at 969.[3]
>
> It follows that statements impugning the integrity of a judge may not be punished unless they are capable of being proved true or false; statements of opinion are protected by the First Amendment unless they "imply a false assertion of fact." *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990); *Lewis v. Time, Inc.*, 710 F.2d 549, 555 (9th Cir. 1983); Restatement (Second) of Torts § 566 (1977) (statement of opinion actionable "only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion"). Even statements that at first blush appear to be factual are protected by the First Amendment if they cannot reasonably be interpreted as stating actual facts about their target. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50, 108 S.Ct. 876, 879, 99 L.Ed.2d 41 (1988). Thus, statements of "rhetorical hyperbole" aren't sanctionable, nor are statements that use language in a "loose, figurative sense."

---

[3] In attorney discipline cases, the burden is on the ISB to establish the alleged misconduct by clear and convincing evidence.  *See, e.g., Matter of Jenkins*, 120 Idaho 379, 382-84, 816 P.2d 335, 338-40 (1991). *See also* I.B.C.R. 522(f). "Clear and convincing" evidence refers to "a degree of proof greater than a mere preponderance."  *Jenkins*, 120 Idaho at 383, 816 P.2d at 339 (citing *Molyneux v. Twin Falls Canal Co.*, 54 Idaho 619, 35 P.2d 651 (1934)).

> *See National Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284, 94 S.Ct. 2770, 2781, 41 L.Ed.2d 745 (1974) (use of word "traitor" could not be construed as representation of fact); *Greenbelt Coop. Publishing Ass'n v. Bresler*, 398 U.S. 6, 14, 90 S.Ct. 1537, 1541, 26 L.Ed.2d 6 (1970) (use of word "blackmail" could not have been interpreted as charging plaintiff with commission of criminal offense).

*Yagman*, 55 F.3d at 1438.

    2.    *Certain statements of fact mixed in with my opinions regarding Judge Winmill were true and, thus, not in violation of Rule 8.2(a) I.R.P.C.*

The disputed statements that Judge Winmill was crooked, rigged the trial, was anti-Christian, or a fascist are opinions that I drew from what occurred at trial. As a matter of course, there are certain statements of fact mixed in with my opinions. Those facts included that Judge Winmill "flipped the verdict and ordered my family to pay $112,000 of their legal fees." There can be no dispute that Judge Winmill overturned the unanimous jury verdict, i.e., "flipped" or that he ordered my family to pay the HOA's attorney fees. (**Exhibit A**, pp. 34-35.) Further, I accused Judge Winmill of having a misconduct charge, which is true, and I even asserted that I was the person who filed the charge against him. (*See* **Exhibit C**.)

The remainder of the disputed statements are as follows: (1) "So we have a corrupt judge;" (2) "The corrupt, Federal Judge Winmill, who tried to rig a jury;" (3) The Judge is a hateful anti-Christian big;" (4) "The judge attempted to rig my jury;" (5) "a crooked federal judge flipped the verdict;" (6) crooked judge overturned a unanimous jury;" and (7) "Idaho has a fascistic federal judge who overturns juries after failing to rig them." Categorically, those disputed opinions can be summarized as concerning "rigging" a jury, being corrupt, being an anti-Christian bigot, and being a fascist.

The opinions that Judge Winmill was crooked, corrupt, and/or tried to rig a jury are similar to those allegations asserted in *Yagman*. As noted in *Yagman*, the attorney told the press that the judge in question "has a penchant for sanctioning Jewish lawyers: me, David Kenner and Hugh Manes. I find this to be evidence of anti-[S]emitism." *Yagman*, 55 F.3d at 1434. The court concluded that this statement mixed fact and opinion. It was true that the three lawyers mentioned were Jewish and that the lawyers were all sanctioned by the judge in question. Because these statements were true, they could not be the basis of attorney sanction. *Id.* at 1438. The court held that the comment regarding anti-Semitism was an opinion that was based on stated facts: the religion of the attorneys and the fact sanctions occurred. *Id.* at 1440. Because the factual basis for the opinion was stated, "[r]eaders were free to form another, perhaps contradictory opinion from the same facts, as no doubt they did." *See also Topp*, 129 Idaho at 416, 925 P.2d at 1115 ("When such statements are made, the audience is not given sufficient information upon which to form an independent judgment; therefore, the expression of opinion is as damaging as an assertion of fact.") (Internal citations omitted.)

Here, I disclosed all the facts supporting my opinion regarding the judge rigging the jury trial and being corrupt/crooked and did not imply I held additional information. The Apple

Docuseries and my Facebook page contain numerous assertions regarding how I formed my opinion that Judge Winmill was corrupt and/or rigged the jury. The support for my opinions is multifactorial: (1) Judge Winmill refused to strike juror no. 11 for cause despite the juror admitting she was biased and prejudiced against my family and me;[4] (2) Judge Winmill prohibited witnesses from testifying to the conduct of HOA members and HOA Board Members;[5] and (3) Judge Winmill's decision to overturn the unanimous jury verdict.[6] For example, I very publicly filed the misconduct allegations against Judge Winmill at the Coeur d'Alene Federal Courthouse. I notified one friend, and on her own, she gathered about 100 members of the public. After emerging from the courthouse, I provided the crowd with copies of relevant pages of the trial transcripts and Judge Winmill's decision. I never made any attempt to obfuscate the facts involving the judge's conduct. Rather, I shared the information with the public. A video made by one member of the public of my comments has since been made available through a YouTube post, wherein I stated:

> I would rather risk losing my license by being honest and saying that by this transcript that I have from this case this judge attempted to rig a jury. What does it say? Well, for one thing it says that one juror said that they were "prejudiced." But they only said prejudice one time, that's what the judge said and it's in this transcript. One time prejudice is okay, if we say it one time. So then we followed that up what do you mean, we're gonna continue with this sure, what do you mean juror what do you mean #11 by prejudice? "Well, I'm biased." Oh, you're biased too, yes.
>
> What other words in the English language that would absolutely disqualify any juror for cause could you possibly say, well yes I'm very very prejudiced I am biased I cannot be fair. The juror was allowed to remain on that jury because we were told they rehabilitated themselves. Maybe I'll be fair, okay I guess I could be fair.
>
> But it got worse then the judge withheld evidence withheld evidence from the court that was legitimate evidence including death threats including four separate women that were assaulted going to a Christmas program on my property and they testified in court but the judge struck their testimony, videotapes of death threats by neighbors withheld from the jury, and then when all of that was said and done because we did have some strikes to remove certain jurors including the ones that had said that they were prejudice we were able to have a unanimous jury verdict in our favor on all four counts after 15 hours of straight deliberations, we won our case unanimous and nearly every civil trial just requires a majority we had a unanimous verdict in our favor but that's not good enough it's not good enough to have a unanimous jury verdict in this country now our case was overturned. But not

---

[4] Included as **Exhibit D** to this correspondence is a link to a video posted my YouTube Channel, https://www.youtube.com/watch?v=0ztRG2Hy58k. (**Exhibit D** at 5:05 – 6:15.)

[5] **Exhibit E** at 6:16 – 7:02.

[6] Included as **Exhibit E** to this correspondence is a link to a video posted to my YouTube Channel, https://www.youtube.com/watch?v=3IoK4UhwVvQ. (**Exhibit E** at 5 at 1:15 – 1:30 (providing a screenshot and quotations from Judge Winmill's Memorandum Decision and Order)).

on appeal, no it was after the judge gave the case to the jury and didn't like the outcome, he just said I'm just gonna undo the outcome.

**(Exhibit D** at 6:16 – 7:02.)

Regarding the decision, Judge Winmill utilized Rule 50 to overturn the unanimous jury verdict. Judge Winmill's decision provided the legal standard for Rule 50 as follows:

> A court may grant a Rule 50 motion for judgment as a matter of law only if "there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Krechman v. County of Riverside,* 723 F.3d 1104, 1109 (9th Cir. 2013) (citing *Jorgensen v. Cassiday,* 320 F.3d 906, 917 (9th Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 149 (2000)). "A jury's verdict must be upheld if it is supported by substantial evidence . . . even if it is also possible to draw a contrary conclusion from the same evidence." *Wallace v. City of San Diego,* 479 F.3d 616, 624 (9th Cir. 2007). **"[I]n entertaining a motion for judgment as a matter of law, the court . . . may not make credibility determinations or weigh the evidence."** *E.E.O.C. v. Go Daddy Software, Inc.,* 581 F.3d 951,961 (quoting *Reeves,* 530 U.S. at 150). Rather, "[t]he evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Id.*

(**Exhibit A**, p. 3.) (Emphasis added.) Despite this legal standard, Judge Winmill repeatedly weighed credibility, as shown in the decision.

> In this case, the key witnesses were Mr. Morris and Ms. Scott. **Mr. Morris was not credible.** The recordings Mr. Morris created of his interactions with other homeowners in the West Hayden Estates show that **he was aggressively confrontational** with those homeowners and routinely **threatened them with litigation**. Ms. Scott testified that Mr. Morris "told . . . [me] a story about how he sued his sister and I think that it just intimidated me that he would sue us if he didn't get his way." **Furthermore, Mr. Morris' testimony was riddled with inconsistencies.** For example, Mr. Morris testified that he only left the 200,000 lights that covered his house on past 8:00 PM one year on Christmas Eve and Christmas. However, a Facebook post authored by Mr. Morris explicitly states on December 23, 2016 that the lights would be left on between 5:00PM to 10:00 PM from December 23rd through Christmas day. Exhibit 3014. Although this inconsistency seems minor, Mr. Morris' testimony was frequently contradicted by extrinsic evidence that he himself created.
>
> **Conversely, Board President Jennifer Scott was convincing and credible throughout her testimony.** Ms. Scott described the rushed process that resulted in the January 2015 Letter and her interactions with Mr. Morris. In particular, she noted that after he received the January 2015 Letter, Mr. Morris called her ten times over a monthlong period. The conversations lasted anywhere between forty-five minutes to an hour and a half. During those calls, Mr. Morris was aggressively

> confrontational with Ms. Scott, who eventually asked him to stop calling her. Eventually, Ms. Scott's interactions with Mr. Morris drove her to resign her presidency.
>
> Of course, Mr. Morris and Ms. Scott were not the only witnesses to testify. **But, the Court's evaluation of their respective testimony is representative of its evaluation of the witnesses in the case more broadly. Almost uniformly, Plaintiffs' witnesses did not present credible testimony that held up under cross-examination. To the contrary, the Homeowners Association's witnesses presented credible testimony that conformed with the extrinsic evidence in the case.**

(**Exhibit A**, pp. 19-20.) (Emphasis added.) Judge Winmill also referred to my video recording as "surreptitious," which cast me in an unfavorable and negative light when I legally recorded discriminatory actions of the HOA. The legal standard also indicated a judge in a Rule 50 motion should not weigh the evidence. However, Judge Winmill weighed the evidence of the January 2015 letter, arriving at a different conclusion than the jury, and then did not even mention a tape-recorded admission from Ms. Scott wherein she admitted that the HOA discriminated against me and my family. This is not only impermissibly weighing the evidence, but it flies in the face of his impermissible credibility analysis of Ms. Scott described above.

Further, at no point did I "imply the existence of additional, undisclosed facts" and certainly never intended to make such an implication, as I repeatedly provided the basis for my opinions. *See Yagman*, 55 F.3d at 1440. Instead, as shown in my Facebook video, I reported the facts of what transpired during the trial and then transitioned into providing "colorfully expressed" commentary. *See Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113, 1124 (C.D. Cal. 1998). By "disclos[ing] the factual basis" of my statement, I revealed that the disputed statements were merely my own "interpretation of the facts presented." *See Yagman*, 55 F.3d at 1439 (internal quotation marks omitted). In fact, I provided copies of the relevant pages of the trial transcripts, Judge Winmill's decision, and other evidence on social media, which were the bases of my opinions. The Facebook and Apple audiences could "accept or reject [my] opinion based on their own independent evaluation of the facts." *Id. See also Berry v. Schmitt*, 688 F.3d 290, 304 (6th Cir. 2012) ("Even assuming that Berry believed that the Commission had broken the law, he provided the public with the facts upon which his opinion relied. The public was free to investigate the Commission's procedures and draw its own conclusions. **The speaker is not required to provide a comprehensive legal analysis to support his every utterance**. For these reasons, Rule 8.2(a) was applied unconstitutionally.") (Emphasis added).

Lastly, my use of hyperbolic rhetoric bolsters this conclusion. "[L]oose, figurative, or hyperbolic language . . . negate[s] the impression" that the contested statement is an assertion of fact. *Milkovich*, 497 U.S. at 21; see also *Underwager v. Channel 9 Australia*, 69 F.3d 361, 367 (9th Cir. 1995) (holding "colorful, figurative rhetoric" nonactionable because "reasonable minds would not take [it] to be factual"); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1054 (9th Cir. 1990), 912 F.2d at 1054 (considering whether "an audience might anticipate rhetoric or hyperbole" because of the "flavor" of the speaker's comments). Here, my language regarding Judge Winmill could only leave the audience with one conclusion: those were statements of my opinion.

3. *Certain statements regarding Judge Winmill were pure opinion and, thus, not in violation of Rule 8.2(a) I.R.P.C.*

The latter two statements that the judge was an anti-Christian bigot and fascist are cut from the same cloth as the claim of anti-Semitism in *Yagman*. However, here there are no statements of facts blended with the opinions regarding the judge being an anti-Christian bigot and fascist. There is nothing approaching an implication that I had additional information regarding these opinions, they were opinions I held based on my interactions with Judge Winmill. To quote *Yagman*, "it follows that statements impugning the integrity of a judge may not be punished unless they are capable of being proved true or false; statements of opinion are protected by the First Amendment unless they "imply a false assertion of fact." *Yagman*, 55 F.3d at 1439 (internal citations omitted). To further quote *Yagman,* "statements of 'rhetorical hyperbole' aren't sanctionable, nor are statements that use language in a loose, figurative sense." *Id.* (internal citations omitted). That is not to say that I did not have any basis for my statements, but purely those bases were mine. Those opinions were based on the totality of what occurred at trial and Judge Winmill's decision to overturn a unanimous jury verdict. Potentially, the issues I had with Judge Winmill's decision-making viewed in isolation (aside from the issues concerning juror no. 11) may not have warranted my conclusions. However, it is the totality of all the decision-making and Judge Winmill's tone and demeanor during my trial that led to my opinions. The opinions regarding the judge being anti-Christian and a fascist were formed after considering the totality of what occurred at trial and contemplating why Judge Winmill failed to provide me the same protections he afforded other litigants, including a transgender inmate,[7] pro-abortionists,[8] and same-sex parents.[9] My conclusion was that my religion, and as an extension my politics, that most certainly are not consistent with Judge Winmill's,[10] was the basis for what I witnessed at rial. For my opinion, I reviewed everything I had witnessed from Judge Winmill and subsequently read about Judge Winmill and came to the inescapable conclusion that he would not have done all those things to a minority relying on the same facts and same laws.[11]

Lastly, I did not arrive at my opinions/conclusions lightly. I have never accused another judge of conduct like I have regarding Judge Winmill. I have also never filed a complaint against a judge. In fact, it was not even my idea to file a misconduct complaint against Judge Winmill, as I was not even aware of the mechanism for doing so. It was at the advice of other lawyers, one of whom came to me—inquiring why this had not already been done, based upon open-source information about the case. As I looked into the standard for filing a misconduct complaint, I considered the conduct of Judge Winmill in my case, including his actions during voir dire, his statements during trial, his wrongful withholding of evidence based on well-established standards

---

[7] https://www.christianpost.com/news/idaho-ordered-to-provide-sex-reassignment-surgery-to-inmate-jailed-for-sexually-abusing-a-child.html.
[8] https://www.christianitytoday.com/news/2013/march/first-fetal-pain-abortion-ban-struck-down-by-court.html.
[9] https://www.ktvb.com/article/news/panel-to-consider-legal-fees-in-same-sex-parent-rights-case/277-32615699-3739-4b23-8331-710732fe2ed7.
[10] https://www.fedbar.org/wp-content/uploads/2019/10/WinmillNovDec2007-pdf-3.pdf. ("Judge Winmill's career path changed, however, when he was doing research for a paper on Clarence Darrow for his English 101 class. Inspired by Darrow, Judge Winmill began studying the lives of other lawyers.").
[11] I also question whether a bar disciplinary action would have been brought against a minority who claimed a judge was racist after experiencing actions during a trial that the minority believed were based on their race.

of law, and his order itself that either withheld from mentioning the most pertinent facts at trial, or otherwise invented or misconstrued them. Filing a misconduct charge against Judge Winmill came at a great personal and financial cost, as the attorneys representing me in the appeal before the Ninth Circuit indicated they would no longer represent me if I pursued misconduct against a judge. (Not because the misconduct charge was false or improper, but because according to other lawyers, "judges talk," which would be negative for their trial and appellate practices.)[12]  However, I had conviction in my opinions and submitted the misconduct charge despite the personal and financial costs.

### III. CONCLUSION

In sum, I believe that my actions described above have been consistent with my professional and ethical obligations. It would be a sad day in America when a lawyer is no longer permitted to engage in transparency with the public when a judge commits conduct that in my opinion, was contrary to the proper administration of law. Whisteblowing statutes were literally created for this express reason: to protect those who serve the public interest with information important to society. Moreover, I provided your letter of investigation to Art Macomber, Idaho Attorney General candidate for 2022. His only response to your letter: "Lawyers do not give up their First Amendment rights." This is very much a First Amendment issue regarding free speech and opinion. *See* Ashley Messenger and Kamesha Laurry, *Karens and Klans: The Recent Flurry of Libel Cases Involving Allegations of Racism*, A.B.A. J. Winter 2023) (an American Bar Association article citing a litany of cases evaluating allegations of racism and noting "[s]uch claims are often dismissed because the statements at issue are "opinion" or conclusions drawn from facts that are provided."). My statements about Judge Winmill were opinions that deserve First Amendment protection, even under the guideposts of Rule 8.2.

With that said, if you have any additional questions or concerns after reviewing this response, please do not hesitate to contact me.

Sincerely,

Jeremy Morris

---

[12] **Exhibit E** at 3:12 – 3:40; 4:07-4:35.