UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JEREMY RAY MORRIS,<br><br>Plaintiff,<br><br>v.<br><br>IDAHO STATE BAR, JILLIAN CAIRES, CARALEE LAMBERT, JOSEPH PIRTLE, JOEL HAZEL, MOLLY O'LEARY, and JOHN DOES 1-100,<br><br>Defendants. | Case No. 1:25-cv-00446-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court are Motions to Dismiss filed by Defendants Idaho State Bar, Jillian Caires, Caralee Lambert, and Joseph Pirtle (Dkt. 34); Defendant Joel Hazel (Dkt. 35); and Defendant Molly O'Leary (Dkt. 37). Having reviewed the record and the parties' submissions, the Court finds that the facts and legal argument are adequately presented and that oral argument would not significantly aid its decision-making process, and it decides the motions on the parties' briefing. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B); *see also* Fed. R. Civ. P. 78(b). For the reasons set forth below, the Court grants the motions to dismiss. The federal claims are dismissed with prejudice, the state-law claims are dismissed without prejudice, and Hazel's request for attorney fees is denied.

## I. BACKGROUND

Morris is an attorney licensed in Idaho (Dkt. 31 at 5, ¶ 20). His claims arise from an Idaho State Bar (ISB) disciplinary investigation concerning public statements he made about United States District Judge B. Lynn Winmill in connection with litigation between Morris and his

homeowners' association (*id.* at 5–7, ¶¶ 20–27). Morris alleges that, in June 2021, he filed a judicial-misconduct complaint against Judge Winmill and later publicly stated, among other things, that Judge Winmill was "crooked," "corrupt," had "tried to rig a jury," and was an "anti-Christian bigot" (*id.* at 6–7, ¶¶ 23–27; Dkt. 31-1 at 2; Dkt. 31-2 at 11).

In December 2021, Defendants Joel Hazel and Molly O'Leary separately contacted ISB Bar Counsel about Morris's statements (Dkt. 31 at 9-10, ¶ 36; *id.* at 11, ¶ 37). Morris alleges that Hazel had a retaliatory motive because Hazel's wife had been involved in separate litigation in which Morris participated and that O'Leary's report was suspicious because it followed Hazel's by four days (*id.* at 9, ¶ 36; *id.* at 11, ¶ 37). The Amended Complaint nevertheless states that "the degree to which Defendants Joel Hazel and Molly O'Leary may have been engaged in this conspiracy is unknown" (*id.* at 3, ¶ 6).

On January 17, 2023, Pirtle wrote Morris, stating he had "enclosed copies of posts from your Facebook account dated December 27, 2021, January 13, 2022, January 27, 2022, and April 10, 2022, which were brought to my attention" (Dkt. 31-1 at 2). Pirtle continued that, "in addition to your Facebook posts," he had been directed to the November 26, 2021 Apple TV release of *'Twas the Fight Before Christmas*, "in which you state, 'that Federal Judge flipped the verdict and ordered my family to pay $112,000 of their legal fees. So we have a corrupt judge.'" Pirtle further stated: "Lastly, please see the attached link to a video clip in which you state: 'the corrupt, Federal Judge Winmill, who tried to rig a jury, who's now facing a misconduct charge that I filed against him.' The video clip also contains a statement at the bottom of the screen: 'THE JUDGE IS A HATEFUL ANTI-CHRISTIAN BIGOT'" (*id.* at 2). Pirtle asked Morris to respond within twenty-one days and to address whether Morris had made those statements "with reckless disregard as to the truth or falsity concerning the qualifications or integrity of a judge" (*id.*).

Morris alleges that, immediately after receiving the letter, he telephoned Pirtle and argued that the investigation targeted constitutionally protected speech, religious expression, and his judicial-misconduct complaint against Judge Winmill; according to Morris, he accused Pirtle of targeting him because of that complaint and Morris's religious and political viewpoint, and Pirtle "did not deny" the accusation (Dkt. 31 at 7–8, ¶¶ 28–30). Morris also submitted a written response to the investigation (*id.* at 9, ¶ 33; Dkt. 31-2 at 2–16).

In July 2023, the ISB Board of Commissioners found probable cause to proceed with formal charges under Rule 8.2(a) of the Idaho Rules of Professional Conduct (Dkt. 31-3 at 2). On August 7, 2023, a South Carolina law firm informed Morris that it would not proceed with his employment application while the ISB matter remained pending, although it invited him to reapply if the matter were favorably resolved (Dkt. 31 at 15, ¶ 47).

Two days later, Morris's attorney contacted ISB seeking a prompt resolution; Assistant Bar Counsel Caralee Lambert confirmed the Board's probable-cause determination and proposed administrative resignation as an alternative to the filing of a public formal charge (Dkt. 31-3 at 2). Under the proposal, ISB would close the disciplinary matter without further action or response from Morris, and Morris could report to South Carolina and other jurisdictions that he had no discipline and no pending disciplinary matter (*id.*). Morris declined the proposal and characterizes it as a "shakedown" (Dkt. 31 at 14–15, ¶ 46). The Amended Complaint alleges ISB never filed formal charges and thereafter took no further action (*id.* at 20–21, ¶ 61; *id.* at 28–29, ¶¶ 85–87). Morris alleges the unresolved investigation prevented him from obtaining employment, forced him to sell his South Carolina property, and damaged his professional reputation (*id.* at 12–16, ¶¶ 39–48; *id.* at 27–30, ¶¶ 81–88).

After filing this action, Morris alleges he discovered that Defendant Jillian Caires, whom he describes as the "then-President of the Idaho State Bar during much of the timeline," had been affiliated with the law firm representing Morris's homeowners' association in the litigation before Judge Winmill. He alleges Caires worked at the law firm representing the homeowners' association, "was copied on nearly every email for years," and "was listed as a lawyer in the case of *Morris v. West Hayden Estates*" (*id.* at 21–22, ¶¶ 62–66; Dkt. 31-12 at 2).

The Amended Complaint asserts four counts. Count I seeks relief under 42 U.S.C. § 1983 for alleged First Amendment retaliation, viewpoint discrimination, unequal treatment under the Equal Protection Clause, and deprivation of property in violation of the Fourth Amendment; it also alleges a conspiracy to retaliate against Morris for exercising his First Amendment rights and seeks attorney fees under § 1988 (Dkt. 31 at 22–28, ¶¶ 68–82). Count II asserts an Idaho Tort Claims Act (ITCA) claim; Count III asserts malicious prosecution under Idaho law; and Count IV asserts federal and Idaho racketeering claims (*id.* at 28–31, ¶¶ 83–92). The Amended Complaint seeks damages and general declaratory relief (*id.* at 31–32).

## II. LEGAL STANDARD

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate when a complaint fails to state a claim upon which relief can be granted. Rule 8(a)(2) requires only a short and plain statement of the claim, showing the plaintiff is entitled to relief and giving the defendant fair notice of the claim and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although a complaint challenged by a Rule 12(b)(6) motion "does not need detailed factual allegations," it requires "more than labels and conclusions." *Id.* "[A] formulaic recitation of the elements of a cause of action will not do." *Id.*

To survive a Rule 12(b)(6) motion, a complaint must allege sufficient facts which, if true, state a plausible claim for relief. *Id.* at 570. A claim is facially plausible when the plaintiff pleads factual content allowing the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility a defendant has acted unlawfully. *Id.* Legal conclusions and conclusory allegations are not entitled to the presumption of truth. *See id.* at 678–79.

Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Twombly*, 550 U.S. at 557. The Court ordinarily limits its review to the complaint, but it may consider documents attached to or incorporated by reference into the complaint without converting the motion to one for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

## III. ANALYSIS

Several issues can be resolved summarily. The Court addresses those matters first, then turns to the remaining individual-capacity civil-rights theories. As to those more involved claims, they fail for several independent reasons as explained below.

### A. Claims Resolved at the Outset

#### 1. ISB and Official-Capacity Claims

Count I alleges that "ISB and its officers" violated Morris's constitutional rights and seeks damages (Dkt. 31 at 22–26, ¶¶ 68–78; *id.* at 31–32). The ISB Defendants move to dismiss any claim against ISB and any official-capacity claim against Caires, Lambert, or Pirtle, arguing ISB is an arm of the Idaho Supreme Court protected by sovereign immunity and that neither ISB nor a state official sued for damages in an official capacity is a "person" under § 1983 (Dkt. 34-1 at 7–

9). Morris's response narrows the dispute, stating "Plaintiff is not making that claim. Rather, Mr. Morris is suing the officers or agents of the Idaho State Bar in their individual capacity as they acted under color of state law" (Dkt. 39 at 4). Thus, Morris has abandoned Count I to the extent it asserts a damages claim against ISB or against Caires, Lambert, or Pirtle in their official capacities.

The claims also fail as a matter of law. The Eleventh Amendment bars damages actions against a State and its arms absent waiver or valid congressional abrogation. *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974). The Idaho Supreme Court has explained that ISB exercises delegated authority from that court and acts "as an arm of the Supreme Court in carrying out its supervisory function." *Idaho State Bar v. Doe (2023-32)*, 551 P.3d 1, 18 (Idaho 2024) (quotation omitted). Count I is therefore dismissed with prejudice against ISB and against Caires, Lambert, and Pirtle in their official capacities.

### 2. Federal RICO and Malicious Prosecution

Count IV invokes the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 196611-1968, alleging that Defendants participated in the affairs of an ISB enterprise through a pattern of racketeering activity. To establish the asserted pattern, the Amended Complaint identifies two allegedly related episodes of wrongdoing within a ten-year period: the disciplinary investigation involving Morris and alleged misconduct involving nonparty Brooks Witzke—the plaintiff in a separate lawsuit involving ISB (Dkt. 31 at 30–31, ¶¶ 89–92); *see Witzke v. Idaho State Bar*, No. 1:22-cv-00478-REP, 2023 WL 3394925, at *12–15 (D. Idaho May 11, 2023). Morris clarifies that his federal RICO claim is directed against individual officials rather than ISB itself and contends the two episodes establish the necessary pattern (Dkt. 39 at 16–18).

That response conflates alleged wrongdoing with the predicate acts RICO requires. "Racketeering activity" is limited to the criminal offenses specified in 18 U.S.C. § 1961(1). *See*

*Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 191 (9th Cir. 1987). The Amended Complaint identifies no qualifying offense. Instead, its two examples concern alleged civil-rights violations and disciplinary misconduct. But "[c]ivil rights violations and injury to reputation do not fall within the statutory definition of 'racketeering activity.'" *Bowen v. Oistead*, 125 F.3d 800, 806 (9th Cir. 1997). Because the Amended Complaint alleges no predicate acts, the federal portion of Count IV fails. The Idaho-RICO claim allegations are addressed separately below.[1]

Morris's response also asserts that ISB officials "can be sued in their individual capacity for malicious prosecution under § 1983" (Dkt. 39 at 18). But Count III does not plead a federal malicious-prosecution claim; it expressly alleges malicious prosecution under Idaho law (Dkt. 31 at 28–30, ¶¶ 83–88). Morris may not amend the Amended Complaint through his opposition brief. *See Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998). The Court therefore addresses Count III only as the state-law claim actually pleaded.

**3. Idaho Tort Claims Act**

Count II asserts a "claim" for violation of the ITCA (Dkt. 31 at 27–28, ¶¶ 79–82). Morris now acknowledges that this claim should proceed, if at all, in state court. He states that he will file a "subsequent motion to sever" the ITCA claim and file it in state court, and later says he will file that motion "contemporaneous to this Response" (Dkt. 39 at 15–16). No such motion was filed.

Morris's underlying jurisdictional point is fair; supplemental jurisdiction does not overcome Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–03, 121 (1984). Because Morris expressly elects not to pursue the ITCA claim in this

---

[1] Although Hazel's motion does not separately parse every federal RICO element, it seeks dismissal of the Amended Complaint under Rule 12(b)(6), and Morris had notice from the ISB Defendants' motion that Count IV was challenged for failure to identify a § 1961(1) predicate. He addressed that precise issue in response (Dkt. 39 at 17–18).

federal action and asks that it be left for state court, the Court dismisses Count II without prejudice. It need not resolve the parties' remaining state-law immunity arguments concerning that claim.

## B. Remaining Federal Civil-Rights Claims

### 1. Regulation of Attorney Speech

Morris's briefing uses several constitutional labels—retaliation for speech and petitioning, free exercise or religious viewpoint, viewpoint discrimination, Equal Protection, and conspiracy—but they share a common factual premise (Dkt. 31 at 22–26, ¶¶ 68–78; Dkt. 39 at 2–6, 11–15). Morris alleges that individual Defendants deliberately used the attorney-disciplinary process against him because he criticized Judge Winmill, filed a judicial-misconduct complaint against Judge Winmill, and expressed a conservative-Christian viewpoint (Dkt. 31 at 22–26, ¶¶ 68–78).

Morris does not contend Rule 8.2(a) of the Idaho Rules of Professional Conduct is facially invalid or that attorneys have a constitutional right to defame judges. To the contrary, he agrees that the rule may regulate knowingly or recklessly false factual accusations. His narrower theory is that his own statements, and in particular the statement that Judge Winmill is an "anti-Christian bigot," were protected opinion and that ISB officials knowingly used Rule 8.2(a) to target him for retaliatory or discriminatory reasons (Dkt. 39 at 14–15). Given the ultimate basis for the Court's opinion—insufficient pleading and immunities—the Court evaluates the allegations on that understanding without giving undue regard to the constitutional label Morris attaches.

Morris's characterization of the challenged statements as improperly targeted for expressing an unfavorable opinion does not resolve their constitutional status. *Standing Committee on Discipline v. Yagman* distinguishes an opinion based on disclosed facts, which permits the audience to evaluate the speaker's inference, from an ostensible opinion that implies the existence of additional, undisclosed facts capable of being proven false. 55 F.3d 1430, 1438–40 (9th Cir.

1995). Morris contends he disclosed the factual basis for his conclusions in the documentary and other public materials he published (Dkt. 31-2 at 11–12).

The Court need not decide whether each challenged statement, viewed in its full context, was ultimately protected or subject to discipline. It is enough to recognize that even Morris's characterization of those statements as opinion does not make them categorically protected. Indeed, *Yagman* observed that terms such as "corrupt" or "crooked"—terms Morris used—may imply unprotected accusations of criminal misconduct. *Id.* at 1441 n.18. Those authorities establish that Rule 8.2(a)-type regulation is constitutionally permissible in at least some circumstances; they do not make an inquiry into statements of this kind categorically unconstitutional.

Morris also states that the ISB Defendants did not separately challenge his Equal Protection and "Viewpoint Discrimination" theories and therefore he did not separately brief them (Dkt. 39 at 2). The same issue arguably applies to Morris's Fourth Amendment allegations.[2] The motion, however, seeks dismissal of Count I and asserts immunity from Morris's § 1983 damages theories, and Morris himself recognizes the Court may apply the immunity arguments to those theories (*id.*).

**2. Caires**

The Amended Complaint alleges Caires was an ISB agent and describes her as the "then-President of the Idaho State Bar during much of the timeline" at issue (Dkt. 31 at 4, ¶ 14; *id.* at 21, ¶ 62). Morris alleges that, after filing this action, he discovered Caires's connection to the underlying HOA litigation. He alleges Caires worked at the law firm representing the

---

[2] For the sake of completeness, the Court notes Morris's Fourth Amendment theory also fails. The Fourth Amendment protects against unreasonable searches and seizures, and the Amended Complaint alleges no search or seizure of Morris's person or property (Dkt. 31 at 23, ¶¶ 70–71). Its allegations that the disciplinary proceeding threatened his law license or caused economic loss do not allege a Fourth Amendment search or seizure.

homeowners' association; "was copied on nearly every email for years"; and "was listed as a lawyer in the case of *Morris v. West Hayden Estates*" (Dkt. 31 at 21–22, ¶¶ 64–66; Dkt. 31-12 at 2). In his opposition, Morris says the "entire point" of his suit is bad-faith targeting and asserts Caires "possibly instigated" the investigation (Dkt. 39 at 7).

Those assertions do not supply the required defendant-specific facts for a § 1983 claim; individual liability under § 1983 must rest on the defendant's own conduct. *Iqbal*, 556 U.S. at 676-77. A defendant causes a constitutional deprivation only if she "does an affirmative act, participates in another's affirmative acts, or omits to perform an act which [s]he is legally required to do that causes the deprivation." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

The Amended Complaint alleges no facts suggesting that Caires contacted Hazel or O'Leary, directed Pirtle or Lambert, participated in the investigation or probable-cause determination, or otherwise acted against Morris in the disciplinary matter. Her prior law-firm affiliation and ISB's subsequent position do not establish participation. Morris's assertion that Caires "possibly instigated" the investigation underscores the deficiency: he describes motivation and a possibility he hopes discovery might confirm, but not conduct he has actually alleged in his Amended Complaint. Count I therefore fails against Caires in her individual capacity.

**3. Hazel and O'Leary**

Hazel and O'Leary are private attorneys, but that does not categorically foreclose § 1983 liability. A private person may act under color of state law by becoming a "willful participant in joint activity with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980); *see also Kirtley v. Rainey*, 326 F.3d 1088, 1092–93 (9th Cir. 2003). Morris relies on that joint-action theory as to Hazel and O'Leary. The question is therefore whether Morris pleads facts supporting joint action, not whether Hazel or O'Leary held public office when they complained to ISB.

As to Hazel, Morris alleges a possible personal motive arising from litigation separate from the HOA case underlying this action. Specifically, Morris alleges that Hazel's wife was involved in a 2020 lawsuit concerning the Coeur d'Alene School Board in which Morris served as counsel, and that the litigation remained ongoing near the time Hazel contacted ISB (Dkt. 31 at 9, ¶ 36; Dkt. 41 at 2–4). Morris clarifies that he is not alleging Hazel controlled ISB's decision to investigate. Rather, he says Hazel "knew exactly what he was doing in lighting a fuse against Mr. Morris's constitutional rights out of a personal vendetta, or collusion with state actors, or both" (Dkt. 41 at 3). That alleged history may supply a reason Morris suspects Hazel had a personal motive to complain, but it does not plausibly show an agreement with a state official. The Amended Complaint identifies no communication establishing such an agreement, no participation by Hazel in ISB's probable-cause determination, and no other concerted conduct between Hazel and an ISB official.

The allegations against O'Leary are similarly insufficient. The Amended Complaint alleges O'Leary contacted Bar Counsel on December 6, 2021, four days after Hazel's December 2 communication (Dkt. 31 at 11, ¶ 37). Morris relies heavily on that four-day interval as circumstantial evidence that the two complaints were coordinated. O'Leary responds that both complaints followed shortly after the November 26 release of 'Twas the Fight Before Christmas, providing an independent explanation for the timing (Dkt. 37-1 at 2–4). Morris counters that O'Leary's actual communication did not mention or link to the documentary; instead, it directed Bar Counsel to Morris's YouTube material. He therefore argues that the four-day interval must be considered together with O'Leary's former position as ISB president, her lack of any prior relationship with Morris, and the advice of unnamed attorneys who told him the sequence appeared "unlikely coincidental" (Dkt. 43 at 3–4).

Morris's own position confirms its deficiency. He says O'Leary "may have colluded" with ISB officials and that discovery is needed "to flesh out the level of cooperation and potential collusion" (Dkt. 43 at 11–12). Pleading on information and belief does not dispense with the requirement to allege factual content making the asserted agreement plausible. *See Twombly*, 550 U.S. at 556–57. Morris's expectation that discovery may reveal coordination does not supply that missing content. Count I therefore fails against Hazel and O'Leary.

Morris's Rule 520 of the Idaho Bar Commission Rules and Supremacy Clause arguments do not change this conclusion. The Court does not rely on Rule 520 to dismiss the federal § 1983 claim against either private Defendant. Accordingly, the Court need not decide whether a state-law privilege could limit a properly pleaded federal civil-rights claim. The federal claims fail because Morris does not plausibly allege state action in the first instance.

### 4. Pirtle and Lambert

#### a. Failure to Plausibly Allege Retaliatory or Discriminatory Purpose

The allegations against Pirtle and Lambert require closer consideration because both personally participated in the disciplinary matter. Pirtle sent the January 17, 2023, investigative letter. Lambert became involved later, after the ISB Board of Commissioners (Board) had found probable cause, and Morris's counsel sought a prompt resolution. Morris contends their actions were components of a broader campaign to retaliate against him for criticizing Judge Winmill, filing a judicial-misconduct complaint, and expressing a conservative-Christian viewpoint. The question at this stage is whether the facts alleged, as distinguished from Morris's characterizations of those facts, plausibly support that asserted purpose.

As to Pirtle, the January 17 letter does not plausibly support an inference that Morris's judicial-misconduct complaint, religion, or viewpoint caused the investigation. The letter identifies

several public statements concerning Judge Winmill and asks Morris to address whether he made them "with reckless disregard as to the truth or falsity concerning the qualifications or integrity of a judge" under Rule 8.2(a) (Dkt. 31-1 at 2). One quoted statement says, in full, "the corrupt, Federal Judge Winmill, who tried to rig a jury, who's now facing a misconduct charge that I filed against him" (*id.*). Morris treats the reference to the misconduct charge as evidence that ISB was investigating him because he had filed that complaint (Dkt. 31 at 25–26, ¶¶ 76–78; Dkt. 39 at 12–14). But the letter identifies the entire public statement—including the accusations that Judge Winmill was "corrupt" and had "tried to rig a jury"—as the subject of the Rule 8.2(a) inquiry. It does not identify Morris's act of filing a misconduct complaint as misconduct or otherwise suggest that Pirtle opened the investigation because Morris had "recklessly" petitioned for judicial discipline.

Morris also relies on Pirtle's alleged silence during a subsequent telephone call. Morris alleges that he accused Pirtle of targeting him because of his complaint about Judge Winmill and his conservative-Christian viewpoint and that Pirtle "did not deny" the accusation (Dkt. 31 at 8, ¶ 30). In his briefing, Morris characterizes that silence as an adoptive admission under Rule 801(d)(2)(B) of the Federal Rules of Evidence (Dkt. 39 at 11). Even assuming the alleged silence may be considered in evaluating the pleadings—Rule 801(d)(2)(B) concerns whether statements are definitionally hearsay, not pleading standards—the allegation does not plausibly establish retaliatory intent. Morris does not allege that Pirtle agreed with his accusation, acknowledged an improper purpose, or made any other statement connecting the investigation to Morris's petitioning activity, religion, or viewpoint. The alleged fact is simply that Morris accused Pirtle of retaliation, and Pirtle did not respond to that accusation.

The allegations concerning Lambert are even further removed from the investigation's initiation or purpose. By the time Lambert became involved, the Board had already found probable cause to proceed with formal charges. Morris's counsel then contacted ISB after a South Carolina law firm declined to proceed with Morris's employment application while the disciplinary matter remained unresolved. Lambert responded to counsel's request, communicated the Board's probable-cause determination, and proposed administrative resignation as a means of resolving the matter without filing a public formal charge. Under the proposal, Morris would not be required to admit wrongdoing and could report that he had no discipline and no pending disciplinary matter (Dkt. 31-3 at 2). Morris characterizes the proposal as a "shakedown" and emphasizes that ISB knew the pending matter was affecting his employment. Those alleged facts establish that Lambert knew the disciplinary matter had practical consequences for Morris and responded to counsel's request for a resolution. They do not plausibly show that Lambert participated in opening the investigation or that she acted with a retaliatory or discriminatory purpose when responding to Morris's counsel.

Morris also relies on what happened afterward. He alleges that ISB had found probable cause and decided to proceed with formal charges; Fox News publicized the dispute in December 2023; and formal charges were never filed (Dkt. 31 at 17, ¶ 51; *id.* at 28–29, ¶¶ 85–87; Dkt. 39 at 4). Morris infers from that sequence that ISB knew the investigation was baseless and abandoned it after public exposure. The Court accepts the alleged chronology, but the chronology alone does not plausibly support that inference. The Amended Complaint alleges no facts showing why formal charges were not filed, who made that later decision, or that the decision reflected a conclusion that the investigation had been retaliatory or baseless. Nor does it allege facts connecting that later

non-filing to Pirtle's motive when he opened the investigation or Lambert's motive when she responded to Morris's counsel.

Morris's broader allegations likewise do not supply the missing defendant-specific facts. He alleges the existence of other attorneys who allegedly criticized judges without being disbarred, but he does not allege whether those attorneys were subject to Idaho disciplinary jurisdiction, whether grievances were filed against them, what statements were presented to disciplinary authorities, or whether Pirtle or Lambert had any involvement in their matters (Dkt. 31 at 9, ¶ 35). Specifically, he alleges that attorney Art Macomber later became the subject of ISB investigations; unnamed Idaho attorneys told Morris that ISB had weaponized ethics rules against other attorneys; and Morris discussed his allegations with federal law-enforcement officials (*id.* at 11, ¶ 38; *id.* at 18, ¶ 53; *id.* at 20, ¶¶ 59–60; Dkt. 39 at 13, 15). None of those allegations identifies conduct by Pirtle or Lambert connecting them to retaliatory treatment of Morris.

Finally, *Witzke* illustrates what is missing here. There, the plaintiff alleged that he overheard the defendant expressing frustration with Witzke and looking for a reason to end Witzke's employment; the defendant later told Witzke, in front of witnesses, that the stated reasons for placing Witzke on leave were pretextual; and the defendant relied on Witzke's alleged misconduct for which Witzke claimed to have an alibi. *Witzke*, 2023 WL 3394925, at *12. Those allegations supplied concrete facts from which retaliatory purpose and pretext could be inferred. Morris alleges no comparable statement, admission, fabricated event, or other defendant-specific fact. His characterizations of the disciplinary matter as "contrived," "retaliatory," or a "sham" do not supply the factual content those labels require, and his reliance on hearsay rules is misplaced.

Considered individually and together, Morris's factual allegations do not plausibly support the inference that Pirtle opened the investigation or that Lambert later acted because Morris filed

the judicial-misconduct complaint, because of his religious or political viewpoint, or for another constitutionally forbidden purpose. Count I therefore fails against Pirtle and Lambert on the pleadings.

**b. Qualified Immunity**

Qualified immunity independently bars the damages claims against Pirtle and Lambert. Qualified immunity protects government officials from damages unless their conduct violated a constitutional right that was clearly established at the time. *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). The clearly established inquiry must be framed at the level of specificity presented by the alleged conduct. *See Reichle v. Howards*, 566 U.S. 658, 664–67 (2012); *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015) (per curiam). Existing precedent must place the constitutional question "beyond debate," and it is not enough to identify a general constitutional principle that applies at a high level of abstraction. *Mullenix*, 577 U.S. at 11–12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

In *United States District Court for the Eastern District of Washington v. Sandlin*, 12 F.3d 861, 866-67 (9th Cir. 1993), the Ninth Circuit upheld discipline under a rule equivalent to Rule 8.2(a), applying an objective reasonable-attorney standard to reckless disregard. In *Yagman*, the Ninth Circuit distinguished factual assertions from constitutionally protected opinion and further distinguished opinions based on disclosed facts from statements that imply additional, provably false facts. 55 F.3d at 1438–40. For example, the antisemitism statement Yagman emphasized was protected because *Yagman* disclosed the facts on which he based that conclusion, allowing readers to evaluate the inference for themselves. *Id.* at 1440.

The Idaho Supreme Court adopted the *Sandlin*/*Yagman* framework in *Idaho State Bar v. Topp*, 925 P.2d 1113, 1116–17 (Idaho 1996). Morris's challenged statements included accusations

that Judge Winmill was "corrupt" and had "tried to rig a jury"—statements that, depending on their context and disclosed factual basis, could convey factual assertions of criminal judicial misconduct rather than merely rhetorical opinion. *Yagman* itself observed that terms such as "corrupt" and "crooked" may imply accusations of criminal misconduct. 55 F.3d at 1441 n.18. The Court need not resolve that ultimate question. For qualified-immunity purposes, existing precedent did not place "beyond debate" that Bar Counsel violated the First Amendment by opening an inquiry to determine on which side of the *Sandlin*/*Yagman*/*Topp* line Morris's statements fell.

Morris is correct on a more general point. Government officials may violate the First Amendment by using investigative authority to punish or deter protected speech or petitioning activity, and an investigation need not culminate in formal charges to be actionable. *See Lacey v. Maricopa County*, 693 F.3d 896, 916–18 (9th Cir. 2012); *White v. Lee*, 227 F.3d 1214, 1237–38 (9th Cir. 2000). Consequently, the fact that ISB allegedly never filed formal charges does not defeat Morris's theory. Nor is his filing of a judicial-misconduct complaint constitutionally irrelevant merely because the disciplinary inquiry concerned later public statements.

But those authorities do not eliminate the requirement that the challenged investigation be undertaken because of the protected activity. *Lacey* required allegations supporting retaliatory animus as the cause of the injury and found a strong inference from the officials' conduct, the absence of probable cause, and the exceptionally close timing between criticism of the investigation and the resulting arrests. 693 F.3d at 916–18. *White* and *Lacey* placed officials on notice that investigative authority may not be used as retaliation for protected speech or petitioning; they did not clearly establish that opening an otherwise authorized disciplinary inquiry into these mixed factual and opinion-laden accusations was itself unconstitutional.

Morris's reliance on *Witzke* does not establish otherwise. He accurately notes that the court there declined qualified immunity after stating that the defendants had offered only a conclusory, one-sentence argument. But *Witzke* did not hold that the relevant right was clearly established. To the contrary, the court expressly stated it was "skeptical that a clearly established right is implicated by the novel circumstances of this case," but denied qualified immunity because the defendants had not carried their burden. 2023 WL 3394925, at *15. *Witzke* therefore supplies no holding placing the constitutional question presented here beyond debate.

Finally Morris is also correct that, under *Hope v. Pelzer*, 536 U.S. 730 (2002), overcoming qualified immunity does not require a case involving materially identical facts. Morris is correct that sufficiently obvious unlawfulness can provide "fair warning." *Id.* at 741. The officials here therefore had fair warning that investigative authority could not be used to punish protected speech or petitioning activity. But, again, what the existing cases did not make obvious was that initiating a Rule 8.2(a) inquiry into statements carrying factual implications of judicial corruption and jury manipulation—whose constitutional status under *Sandlin*, *Yagman*, and *Topp* depended on context and factual support—was itself unconstitutional. Because this case does not present an obvious violation in which general First Amendment principles supplied the missing clearly established rule, Pirtle and Lambert are entitled to qualified immunity from damages.

**c. Morris's Bad-Faith Argument and Quasi-Judicial Immunity**

Lambert also asserts quasi-judicial immunity as an independent ground for dismissal, and Morris responds that such immunity cannot apply because "[t]he entire point" of his lawsuit is that ISB officials acted in bad faith and for retaliatory purposes (Dkt. 39 at 7). He relies on *Imbler v. Pachtman*, *Burns v. Reed*, *Harvey v. Waldron*, and *Witzke* to argue that conduct outside a protected prosecutorial function is not absolutely immune (*id.* at 6–10).

Morris is correct as to the governing framework. A prosecutor—or, by analogy, bar counsel—is not necessarily absolutely immune merely because challenged conduct occurred in connection with a prosecution or disciplinary matter. Absolute immunity is functional. Investigative and administrative conduct outside the prosecutor's advocacy function generally receives, at most, qualified immunity. *See Burns v. Reed*, 500 U.S. 478, 486, 492–96 (1991); *Lacey*, 693 F.3d at 912–14.

But alleged retaliatory motive does not itself determine the immunity question, as Morris's own authority makes clear. Once the challenged act is prosecutorial in function, an allegation that the prosecutor acted maliciously or for an improper purpose does not transform that act into an investigative one. *Imbler v. Pachtman* protects conduct intimately associated with the prosecutorial function notwithstanding allegations of serious misconduct in performing that function. 424 U.S. 409, 427, 430–31 (1976). *Witzke* is consistent with that distinction: it declined quasi-judicial immunity because the conduct at issue was investigative rather than adjudicatory or prosecutorial. 2023 WL 3394925, at *14.

Lambert's alleged conduct falls on the prosecutorial side of that line. By the time she became involved, the Board had already found probable cause to proceed with formal charges. Her alleged role was to communicate that determination and, after Morris's counsel sought a resolution, to propose resolving the disciplinary matter through administrative resignation rather than formal prosecution (Dkt. 31-3 at 2). Those acts are charging and settlement functions, not evidence-gathering or investigative acts. *Hirsh v. Justices of the Supreme Court of California* extends quasi-judicial immunity to bar officials performing prosecutorial functions, 67 F.3d 708, 715 (9th Cir. 1995), and *Wu v. State Bar of California* persuasively treats decisions to prosecute

and settle a disciplinary matter as "essential prosecutorial functions," 953 F. Supp. 315, 319–20 (C.D. Cal. 1997).

Accordingly, Lambert is absolutely immune from damages for the conduct specifically alleged against her. Morris's characterization of the proposal as a retaliatory "shakedown" does not alter the function Lambert was performing.[3]

### C. Remaining State-Law Claims

After dismissal of Count II as discussed above, the remaining state-law theories are Count III's Idaho malicious-prosecution claim and the Idaho-law portion of Count IV (Dkt. 31 at 28–31, ¶¶ 83–92). The parties dispute, among other things, the scope of Rule 520 and whether its privilege for disciplinary grievances and related conduct admits the fraud, malice, or collusion exception Morris proposes (Dkts. 34-1 at 13–16; 35 at 7–8; 41 at 4–7). The Court need not decide that state-law question.

The Amended Complaint invokes both federal-question and diversity jurisdiction (Dkt. 31 at 3–4, ¶¶ 7–8), but it does not adequately plead diversity jurisdiction. It alleges where Morris and the individual Defendants reside, not their citizenship (*id.* at 4, ¶¶ 11–17). Residence alone does not establish citizenship for purposes of diversity jurisdiction. *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001). With all federal claims dismissed, the Court declines supplemental jurisdiction over the remaining state-law claims under 28 U.S.C. § 1367(c)(3). The disputed scope

---

[3] Although the Doe Defendants have not appeared, the Court's conclusions regarding Morris's federal claims apply equally to them. The Amended Complaint alleges no distinct conduct by any Doe Defendant that would cure the pleading deficiencies identified above; instead, it alleges only that unidentified Does participated in the same asserted conspiracy and enterprise. Accordingly, the Court dismisses the federal claims against the Doe Defendants for the same reasons. *See Silverton v. Dep't of Treasury*, 644 F.2d 1341, 1345 (9th Cir. 1981).

of Rule 520 presents an additional reason to avoid unnecessarily deciding a novel or unsettled question of Idaho law. *See* 28 U.S.C. § 1367(c)(1).

Accordingly, Count III and the Idaho-law portion of Count IV are dismissed without prejudice. The Court does not reach the merits of Morris's Idaho malicious-prosecution theory, the Idaho RICO theory, or the parties' competing interpretations of Rule 520.

**D. Leave to Amend**

The moving Defendants request dismissal with prejudice (Dkt. 34 at 2; Dkt. 35 at 1; Dkt. 37-1 at 8–10). Rule 15 directs courts to "freely give leave when justice so requires," but leave may be denied for futility, undue delay, bad faith, prejudice, or repeated failure to cure pleading deficiencies. Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962).

This not a case in which Morris first learned of the asserted pleading deficiencies from the Court's ruling. All three groups of Defendants moved to dismiss the original Complaint on September 25, 2025 (Dkts. 24, 25, 27). After receiving those motions, Morris moved for an extension expressly "in contemplation that Plaintiff will file an Amended Complaint" and explained that he had discovered "new and important information not contained within the Original Verified Complaint" that he wished to incorporate (Dkt. 29 at 1; Dkt. 29-1 at 2). He requested the extension "so that Plaintiff may amend his Complaint" and acknowledged that Defendants might thereafter modify and refile their motions (Dkt. 29-1 at 2). The Court granted the extension "in lieu of Plaintiff's soon-to-be-filed Amended Complaint" and expressly contemplated refiling of the motions after amendment (Dkt. 30). When Morris filed the Amended Complaint on October 25, the Court accordingly denied the original motions as moot, noting that Morris had chosen amendment "in response" to them (Dkt. 33).

Those motions gave Morris targeted notice of several defects that remain now. O'Leary's original motion explained that the claim against her rested on the four-day timing between the two complaints and that the Complaint alleged no facts supporting an inference of conspiracy (Dkt. 24-1 at 2–7). Hazel's original motion explained the state-action and joint-action requirements and argued that Morris alleged no facts showing Hazel participated with ISB in the investigation or otherwise acted under color of state law (Dkt. 25 at 2–6). Further, counsel's August 21 letter had made substantially the same point before that motion was filed (Dkt. 26-1 at 1–2). The ISB Defendants' original memorandum likewise characterized Morris's allegations of individual wrongdoing as "conclusory, non-specific, and non-factual," explained that any individual-capacity theory lacked supporting factual content, and specifically noted that Morris alleged no act by Caires (Dkt. 27-1 at 5, 9–11).

Morris used the amendment opportunity to add facts he had learned after filing suit. Most notably, he added allegations that Caires had been affiliated with an opposing law firm, had been copied on communications in the underlying HOA litigation, and had been listed as a lawyer in that matter (Dkt. 31 at 21–22, ¶¶ 62–66). Those allegations still identify no act by Caires in initiating, directing, investigating, or deciding the disciplinary matter. The amendment likewise did not supply the missing joint-action allegations as to the private Defendants. Indeed, the Amended Complaint continues to state that "the degree to which Defendants Joel Hazel and Molly O'Leary may have been engaged in this conspiracy is unknown" (*id*. at 3, ¶ 6).

Some defects are legal and cannot be cured by additional factual pleading: the § 1983 damages claims against ISB and the officials in their official capacities are barred, and Lambert is absolutely immune from damages for the post-probable-cause prosecutorial and settlement functions alleged. The remaining federal theories fail for lack of factual content Morris has already

had an informed opportunity to supply. Neither the Amended Complaint nor Morris's opposition papers identify another concrete set of additional existing facts he proposes to plead showing Caires's participation, joint action by Hazel or O'Leary, a qualifying federal RICO predicate, or defendant-specific facts plausibly connecting Pirtle's or Lambert's conduct to a retaliatory or discriminatory purpose. Instead, Morris repeatedly states that discovery is needed to determine whether the suspected coordination and scheme occurred (Dkt. 41 at 2–4; Dkt. 43 at 4, 11–12). The Court does not find that argument persuasive in this context.

Consequently, under these uncommon circumstances, further amendment of the federal claims is not warranted. That conclusion is reinforced by the fact that Morris, although proceeding pro se, is himself an attorney and expressly amended after reviewing the motions identifying these deficiencies. The federal claims are therefore dismissed with prejudice. The state-law claims are dismissed without prejudice.

**E. Hazel's Request for Attorney Fees**

Hazel requests attorney fees under 42 U.S.C. § 1988(b), arguing Morris knew Hazel was a private attorney, had been warned that the allegations did not establish state action, and nevertheless persisted in asserting constitutional claims against him (Dkt. 35 at 8–10). A prevailing civil-rights defendant may recover attorney fees when the plaintiff's action was "frivolous, unreasonable, or without foundation." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978); *see Barry v. Fowler*, 902 F.2d 770, 773 (9th Cir. 1990).

Hazel has obtained dismissal with prejudice, but Morris's legal theory—that a private person may act under color of state law by willfully participating in joint activity with state officials—is recognized by *Dennis*, 449 U.S. at 27–28. His claim fails because the facts pleaded do not plausibly establish such joint action, not because the asserted legal theory is frivolous or

foreclosed. The August 21 warning and Morris's failure to cure the factual deficiency support Hazel's contention that Morris persisted despite notice of the problem, but they do not establish that the claim itself was frivolous, unreasonable, or without foundation. Morris's separate argument that Rule 520 is not a fee-shifting provision does not alter the analysis because Hazel seeks fees under § 1988, not under Rule 520 (Dkt. 41 at 6–7). Hazel's request for attorney fees is denied.

## IV. ORDER

**IT IS ORDERED that:**

1. Defendants Idaho State Bar, Jillian Caires, Caralee Lambert, and Joseph Pirtle's Motion to Dismiss (Dkt. 34) and Defendant Molly O'Leary's Motion to Dismiss (Dkt. 37) are **GRANTED**. Defendant Joel Hazel's Motion to Dismiss (Dkt. 35) is **GRANTED IN PART** and **DENIED IN PART**; Hazel's request for attorney fees under 42 U.S.C. § 1988(b) is **DENIED**.

2. All federal claims, including Count I and the federal RICO portion of Count IV, are **DISMISSED WITH PREJUDICE**.

3. Count II, the Idaho Tort Claims Act claim, is **DISMISSED WITHOUT PREJUDICE**.

4. Count III and the Idaho-law portion of Count IV are **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(1) and (3).

5. The Clerk of Court is directed to enter judgment and close this case.

UNITED STATES COURTS DISTRICT OF IDAHO

DATED: September 09, 2026

Amanda K. Brailsford

Amanda K. Brailsford
U.S. District Court Judge